IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| TONY MAURICE WATTS, <br> Plaintiff | * | |
| | * | |
| v. | | CIVIL ACTION NO. DKC-10-1983 |
| | * | |
| KATHLEEN GREEN, et al., <br> Defendants | * | |

******

MEMORANDUM

On July 20, 2010, the court received Plaintiff Tony Watts' civil rights complaint seeking compensatory damages pursuant to 42 U.S.C. § 1983. Watts alleges Defendants failed to protect him from assault by another inmate. ECF No. 1.

Defendants, Warden Kathleen Green, former Chief of Security Michael King, Lieutenant Charles Thorne, Sergeant Walter Donoway[1], Captain Bruce Brimer, CO II Darrell Tyler, CO II John Kardiasmenos and CCMS II Krista Bozman have filed a Motion to Dismiss, or in the Alternative for Summary Judgment. Paper No. 15. Plaintiff has filed an opposition. Paper No. 17. No hearing is necessary. *See* Local Rule 105.6 (D. Md. 2011). For the reasons stated below, the dispositive motion filed by Defendants, treated as a motion for summary judgment, will be denied, although the claims against Lieutenant Thorne will be dismissed.

Background

The parties do not dispute that on September 28, 2009, Plaintiff and inmate Ricardo Blake, both Protective Custody inmates, were found fighting in the day room of ECI's Housing

---

[1] The Clerk shall be directed to amend the docket to reflect the correct spelling of Defendant's name.

Unit 5's A tier. Both inmates were issued infractions for the fight and subsequently found guilty of rule infractions and sentenced to disciplinary segregation. ECF Nos. 1 & 15, Ex. A.

On November 10, 2009, Plaintiff and Blake ended their disciplinary segregation. The "traffic section" assigned Plaintiff and Blake to the same cell. After Plaintiff was placed in the cell with Blake, Officer Tyler heard noise coming from the back of 5-A tier and went down the tier to cell 15 where he saw Plaintiff and Blake "rolling around together" on the cell floor. The inmates were separated and taken to the medical department for evaluation. Thereafter they were placed in separate cells. ECF No. 1 & 15, Ex. A, pp. 10, 12.

What policy was (or should have been) in place at the time of the two altercations, as well as what Defendants knew or should have known about the incidents, remain disputed. Plaintiff avers that he told Defendant Kardiasmenos that he and Blake had been in a fight and could not be housed together but Kardiasmenos told Plaintiff that if he did not lock into the cell he would be issued an infraction. ECF Nos. 1 & 8. Inmate Blake declares that he heard Watts tell Kardiasmenos that he and Watts could not be housed together. Blake further states that he also advised Kardiasmenos that they could not be housed together. ECF No. 8. Inmate Eugene Belin has also signed a statement that he heard Watts tell Kardiasmenos that he could not be housed with Blake. *Id*.

Plaintiff alleges that Krista Bozman did not follow DOC policy in that she neither added Blake to Plaintiff's enemy list after the first fight, nor did she interview Plaintiff after the first altercation to determine whether Blake should be added to Plaintiff's enemy list. ECF No. 13. Plaintiff states that Walter Donoway was the Officer in Charge ("OIC") on the day of the second altercation and as the OIC was aware or should have been aware of the previous altercation between Plaintiff and Blake thus Donoway was deliberately indifferent in not intervening to

prevent Plaintiff from being forced to lock-in with Blake. *Id*.  Plaintiff alleges that Chief of Security Michael King was also aware of the first altercation between Plaintiff and Blake as Plaintiff had written to King on numerous occasions asking if there was a "keep separate" on him and Blake.  Plaintiff also states that he tried to speak with King on three occasions but King refused to speak with him. *Id*.  Plaintiff alleges that Defendant Brimer was the shift commander on the date of the second altercation.  He states that both he and Blake received infractions for the November 10, 2009 altercation but that Brimer threw out the infraction indicating his knowledge that Plaintiff and Blake should not have been housed together. *Id*.  Additionally, Plaintiff alleges that Warden Green deliberately disregarded the policy of ECI regarding housing of Protective Custody inmates and failed to ensure ECI staff followed protocol and procedure regarding the housing of inmates. *Id*.  Plaintiff has made no specific allegations as to Lt. Thorne. *Id*.  Plaintiff claims that he suffers back pain and psychological difficulty as a result of the second altercation. *Id*.

Defendants claim that the first fight between Plaintiff and Blake was a minor occurrence and the second fight was likely a staged event.  ECF No. 15.  Bozman avers that at the time of the first fight case management staff were not automatically or routinely informed of "every minor altercation between inmates."[2]  *Id*., Ex. F.  Kardiasmenos avers that he had no knowledge

---

[2] Bozman avers that case management staff were not automatically informed of every minor altercation. *Id*., Ex. F.  Investigation of the events by Captain Chester revealed that "[a]ccording to Classification Personnel, inmates involved in a physical altercation are not automatically placed on each other's Enemy Lists, it is done on a case by case basis.  If an inmate is stabbed by another inmate, those inmates are usually placed on each other's Enemy List. The Institutional Adjustment Officer stated to me he sometimes places inmates on each other's Enemy Lists as a result of adjustment findings." *Id*., Ex. A, p. 19.  Captain Chester concluded his investigation stating, "the altercation that occurred on September 28, 2009 should have been entered in OBIS after the adjustment hearings for the involved inmates.  The OIC of Housing Unit 5 should have reviewed the log entries from the previous shifts to be aware of what happened.  The 3-11 Shift Commander should also have sent an E-mail or memo to the Day Shift Commander to make him/her aware of what happened on the Protective Custody tier.  Protective Custody inmates present a unique situation due to PC Segregation inmates having to be housed in the same tier as PC general

that Plaintiff and Blake had been in an altercation prior to November 10, 2009 (the second fight), and denies that Plaintiff informed him that he should not be celled with Blake. *Id*., Ex. G. Donoway likewise denies any knowledge of the first altercation between Plaintiff and Blake and avers that he has no recollection of Plaintiff gesturing to him to get his attention on the date of the second incident. *Id*., Ex. D. King also denies being aware of any problem between Plaintiff and Blake or any knowledge that Plaintiff tried to contact him. *Id*., Ex. E. Defendants further dispute the severity of Plaintiff's injuries stemming from the November 10, 2009 altercation and maintain that the fight between Plaintiff and Blake was a staged event. ECF No. 15.

Standard of Review

Fed. R. Civ. P. 56(c) provides that summary judgment:

> should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

---

population inmates. Better communication between the shifts needs to occur in the future to prevent a situation like this from occurring again." *Id*., p. 20.

King avers that prior to November, 2009, there **had** been an unwritten policy or practice at ECI that when inmates fought, case management and the traffic section should be informed of the altercation; however, inmates were not automatically placed on each other's enemy lists. *Id*., Ex. E. When a fight was reported a keep separate order would be generated so that traffic would know not to house the inmates together when they came off lockup. This did not happen in the instant case. King opines that this was "probably because the September 28 incident was a minor one." Defendants do not reveal what constitutes a minor versus major altercation. The September 28 incident resulted in the use of pepper spray, preparation of use of force reports, evaluation of the inmates by medical staff, issuance of infractions, findings of guilt, and sentences of 150 days of disciplinary segregation. ECF No. 1 & 15. After the November, 2009 incident it was made a standard procedure at ECI that case management and traffic staff are notified of all fights between inmates, even minor incidents. *Id*. Ex. E.

4

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to....the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

Analysis

Exhaustion

Defendants assert that Plaintiff's case should be dismissed in its entirety due to Plaintiff's failure to exhaust available administrative remedies. The Prison Litigation Reform Act ["PLRA"] generally requires a prisoner plaintiff to exhaust administrative remedies before filing suit in federal court. Title 42 U.S.C. § 1997e(a) provides that "[n]o action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." The Supreme Court has interpreted the language of this provision broadly, holding that the phrase "prison conditions" encompasses "all inmate suits about prison

life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Thus, the exhaustion provision plainly extends to Plaintiff's allegations. His complaint must be dismissed, unless he can show that he has satisfied the administrative exhaustion requirement under the PLRA or that defendants have forfeited their right to raise non-exhaustion as a defense. *See Chase v. Peay*, 286 F.Supp.2d 523, 528 (D. Md. 2003).

The PLRA's exhaustion requirement is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process. *Chase*, 582 F.Supp.2d at 530; *Gibbs v. Bureau of Prisons*, 986 F.Supp. 941, 943-44 (D. Md. 1997) (dismissing a federal prisoner's lawsuit for failure to exhaust, where plaintiff did not appeal his administrative claim through all four stages of the BOP's grievance process); *Booth v. Churner*, 532 U.S. 731, 735 (2001) (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003) (noting that a prisoner must appeal administrative rulings "to the highest possible administrative level"); *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (prisoner must follow all administrative steps to meet the exhaustion requirement, but need not seek judicial review).

In Maryland, filing a request for administrative remedy with the Warden of the prison in which one is incarcerated is the first of three steps in the Administrative Remedy Procedure ("ARP") process provided by the Division of Correction to its prisoners. If this request is denied, the prisoner has ten calendar days to file an appeal with the Commissioner of Correction. If this appeal is denied, the prisoner has thirty days in which to file an appeal to the Executive Director

of the Inmate Grievance Office ("IGO"). *See* Md. Code Ann. Corr. Serv. §§ 10-206, 10-210; Md. Regs. Code title 12 § 07.01.03.

The facts regarding Plaintiff's efforts to exhaust his administrative remedies are in dispute. Plaintiff states that he filed an ARP complaint on November 25, 2009. ECF No. 17, Attachment. On January 25, 2010, having not received any response to his ARP, Plaintiff filed an appeal to the Commissioner of Correction. Plaintiff's ARP was denied by the Warden on February 5, 2010, after Plaintiff had proceeded to the Commissioner. On February 23, 2010, Plaintiff filed an IGO complaint. ECF No. 17. Defendants maintain that Plaintiff should have resubmitted his appeal after receipt of the Warden's denial of the ARP rather than filing directly with the IGO. They do not address what, if any, implications the Warden's untimely response to the ARP has on Plaintiff's ability to properly exhaust his remedies. Given the information before the court, the court cannot say that Plaintiff failed to exhaust his "available" remedies by filing his appeal prior to receipt of the Warden's denial and then proceeding to the IGO. *See Taylor v. Barnett*, 105 F.Supp.2d 483, 486 (E.D. Va. 2000).

Respondeat Superior

Defendants maintain that Plaintiff's complaint against Warden Green, Security Chief King, Captain Brimer, Lieutenant Thorne, and Sergeant Donoway is based solely upon the doctrine of *respondeat superior.* ECF No. 15. The doctrine of *respondeat superior* does not apply in §1983 claims. *See Love-Lane v. Martin*, 355 F. 3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under §1983); *see also Trulock v. Freeh*, 275 F. 3d 391, 402 (4th Cir. 2001) (no respondeat superior liability in a *Bivens* suit). Liability of supervisory officials must be "premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on

7

those committed to their care.'" *Baynard v. Malone*, 268 F. 3d 228, 235 (4th Cir. 2001), *citing Slakan v. Porter*, 737 F. 2d 368, 372 (4th Cir. 1984). Supervisory liability under § 1983 must be supported with evidence that (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff, (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices, and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F. 3d 791, 799 (4th Cir. 1994).

Plaintiff's allegations do not rest on *respondeat superior* as a theory of liability. Plaintiff has alleged that Brimer and Donoway as shift commander and OIC, respectively, each knew or should have known that Plaintiff could not be housed with Blake. Plaintiff further alleges that Brimer, Donoway, Green, and King failed to follow existing ECI procedure regarding the reporting of assaults and generating of keep separate orders for ECI inmates which directly resulted in the November 10, 2009 altercation. The investigation by Captain Chester supports Plaintiff's allegations by stating that Brimer, the Shift Commander, and Donoway the OIC failed to take the appropriate steps after the first altercation to prevent Plaintiff and Blake being assigned to the same cell. ECF No. 15, Ex. A, p. 20. Additionally, Plaintiff alleges that he attempted to communicate with King on several occasions in order to discern whether a keep separate order had been entered as to he and Blake but King, the Chief of Security, never responded. In light of the foregoing, Plaintiff's claims against Green, Brimer, King and Donoway shall proceed.

Plaintiff, however, has pointed to no action or inaction on the part of Thorne that

resulted in a constitutional injury and, accordingly, his claims against Thorne shall be dismissed.

Eighth Amendment

Plaintiff alleges that all named Defendants were deliberately indifferent in failing to provide adequate supervision and security to protect him and as such his right to be free from cruel and unusual punishment has been violated. The Eighth Amendment does recognize this right. *See Belcher v. Oliver*, 898 F.2d 32, 34 (4th Cir. 1990).

As noted by the Supreme Court in *Farmer v. Brennan*, 511 U.S. 825 (1994).

> Prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners. Having incarcerated persons with demonstrated proclivities for antisocial criminal, and often violent, conduct, having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course. Prison conditions may be restrictive and even harsh, but gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objective any more than it squares with evolving standards of decency. Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society.

*Id*. at 833 (internal quotations and citations omitted). In a failure to protect claim, a prisoner must show, first, that the harm he suffered was objectively serious, and second, that prison officials acted with deliberate indifference. *Id*. at 834.

Plaintiff must confront Defendants' summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial. This he has done. There are genuine disputes of material fact concerning the security policies in place at the time of the November 10 altercation and whether they were followed; whether Defendants knew or should have known of the risk of harm to Plaintiff; and the nature and severity of Plaintiff's injuries resulting from the altercation. There exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," as such

summary judgment is inappropriate. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) ("Credibility determinations ... are jury functions, not those of a judge...."). Further, if the actions of Defendants occurred in the manner alleged by Plaintiff, qualified immunity would not apply.

## Conclusion

For the aforementioned reasons, summary judgment cannot be granted at this time as to the Defendants Green, King, Bozman, Kardiasmenos, Donoway, Tyler and Brimer. Plaintiff's complaint against Thorne shall be dismissed. Counsel shall be appointed for Plaintiff. A separate Order follows.

\_\_August 18, 2011\_\_                                        _____/s/_____
Date                                                                      DEBORAH K. CHASANOW
                                                                                 United States District Judge